Case number 23-1264 et al. Sunflower Electric Power Corporation Petitioner v. Federal Energy Regulatory Commission. Ms. Murphy for the petitioners, Ms. Bentha for the respondents, Ms. Taylor for the interviewers. Good morning, Ms. Murphy. You may proceed when you're ready. Thank you, Your Honor. And may it please the Court, Erin Murphy, on behalf of the petitioners. The SPP tariff amendment at issue here was proposed to address a serious cost causation problem in parts of the region owing to certain wind-rich zones. FERC recognized this much in its first set of orders addressing that amendment, where it expressly encouraged SPP's efforts to remedy the cost causation problem, and ultimately accepted the amendment, subject to two minor tweaks, that it found would fully address any lingering concerns about the scope of the SPP Board's discretion to approve alternative cost allocations for certain transmission facilities. Yet nine months later, FERC completely reversed course. Though nothing had changed in the interim save the Commission's composition, a newly constituted FERC now concluded that the very same amendment that it had just found fully addressed any concerns about discretion and transparency somehow no longer did. That about-face can't be reconciled with the FPA or with the APA. Under the FPA, FERC is required to address cost causation problems that it identifies, not sweep them under the rug, let alone reinstate them shortly after having accepted an effort to correct them. And under the APA, FERC has an obligation to adequately explain itself when it abandons earlier findings made on the exact same record and departs from its own precedent to boot. Yet FERC didn't even acknowledge its earlier expressed findings that the tariff amendment no longer posed any discretion and transparency concerns, and its efforts to distinguish past orders that approved exercises of far greater discretion with far less transparency by the SPP Board are so flimsy as to border on contextual. In short, FERC's orders smack of a result in search of a reason and can't be sustained. Why should we hear this case given that your client essentially got all the relief they could ever want and even more relief than they can get in this case in your other proceeding, the waiver application? So for two reasons. First, in the waiver application, while that proceeding is now final before FERC, it's very much still a matter of live dispute because the same parties that are here as respondent interveners defending FERC's rejection of this tariff amendment have already filed petitions for review with this challenging those proceedings and those orders before FERC. So we have a live dispute that still is ongoing in the courts, which is enough to dispel any concerns about mootness. But second, and more broadly, I think the court's recent Norfolk Railway case deals with another dynamic where a case was still pending, there was litigation still pending, and the court said it didn't matter whether it's likely or unlikely what the result in that litigation will be. It's that there was still litigation pending, so the dispute was still live. And don't get me wrong, we certainly think that FERC's orders were absolutely correct, and we fully intend to defend them before this court, but there is absolutely still a live dispute before this court about those proceedings. But even beyond that, what's different about those proceedings and this proceeding is actually those proceedings concern only a particular set of existing facilities and whether their costs should be reallocated. What's different about this proceeding is what the stakeholders were all trying to do here is come up with a chair of amendment that would create a going forward fix, so that when we have new facilities that come online or upgrades to existing facilities in regions that satisfy, in the zones that satisfy this criteria, you could allocate their costs this way from the start, rather than having to deal with this as an after-the-fact issue or go through a complete set of FERC proceedings to deal with it as each and every facility comes online. So... I'm sorry, I didn't mean to interrupt. No, no. I have a sort of a basic question, which is the cost that we're talking about here, these are the costs of constructing the transmission infrastructure or... I mean, the cost basically then gets spread over the lifetime of the transmission facility. So the cost of constructing that are amortized... Constructing and there's some... Exactly, exactly. Not the cost of the actual transmission of the power, which is... It's essentially, that's why it's cost allocation, is the concept of taking the costs that you kind of know will exist from the facility and figuring out how they should be allocated among the region, which I think actually, you know, goes to why there's really not a serious argument about standing here, because what the petitioners are here and the respondents are here, we're all members of SPP who pay these costs. And so we all have a profound interest in what the allocation of the costs will be, both for existing facilities and as future facilities come online. Well, the question is, what future facilities? I mean, what imminent harm is there? Sure. It seems a little vague in the factual presentation that we've gotten and the other petitioner, SPP, doesn't identify any future facilities in their papers or in their briefs. Yeah, and I think it's fair to say that at the moment of these orders and this briefing, there weren't particular new facilities that had been planned to come online, but SPP plans on kind of a rolling basis, so you have new facilities come online. Pretty much at any given year, they're going to be approving new facilities. It's my understanding they're actually... This isn't in the record because it's more recent, but proving the point that we expect there to be future facilities, there is at least one facility planned in the Midwest region that could be a candidate for this kind of waiver. So I think the reason we're still here and the reason the respondent interveners are still here is everybody recognizes that there's going to be future transmission needs, particularly in the zones that satisfy the first criteria here that SPP would have set up. Because the whole reason we have this dynamic, this cost allocation problem, is because there's a very high volume of generation going on in these zones, this significant substantial increase in wind generation over the past decade that's continuing to increase. And as you have more generation come online, you're going to need more transmission, you're going to need upgrades to existing facilities, and the facilities in these regions are predominantly byway facilities, which are the kinds of facilities at issue in the proposed tariff amendment. Assume that what you said about possible future facilities coming online and being eligible for this, it would be enough to defeat mootness. I'm still, I'd love to hear why as a practical matter, you're opposing abeyance, which would allow us to consider this case along with the other. And as you know, the rehearing order has already issued. It seems like there'll probably be a delay of about another year that would allow the court to have all of these related issues before it. And it does seem, at least to my understanding, hard for you to say there's likely to be another facility in the next year that you're actually going to miss out on being able to pursue this for. Does that, could you respond to that? Yes. So I think, you know, I mean, from our perspective, this case is fully briefed. And this case is actually kind of broader than the other case. The issues are a fix for the whole SDP region. And so if anything, it makes more sense to be considering this case first, because we wouldn't have ever even needed the other case and gotten to those orders. If this tariff amendment had gone into place, we would have just gone through the tariff amendment process rather than SDP needing to file a separate 205 for those particular facilities. So if anything, the order seems right to sort of start with the question of, okay, is this something that SDP can fix on a region-wide basis? Can it have an amendment here that allows for cost allocation consistent with the ex-ante principle that the other side is bringing up here? You know, SDP is trying to do something consistent with that and say, let's put something in the tariff that tells everybody what the rules of the road are going to be as new facilities come online. And it's important for planning purposes to know that. You know, everybody would rather know at the front end what it's going to look like. So I think it really does serve those principles and planning that whole- But even if you prevail in this case, that only gives you an opportunity to essentially apply for a wing. You don't necessarily get it. You might. Maybe the odds are that you will, but if it's denied, then you'd be challenging and you'd back here challenging that, presumably. Certainly. As for these four facilities, you've been granted. That was the whole purpose of that process. And the papers talk about an upcoming facility that's unaffiliated, which I presume means that it's not yours. What is unaffiliated? I don't think there's any. At the time of the briefing, we were not arguing that there's any particular facility that's coming online for either of the petitioners that would be beyond the four that are already dealt with in the separate proceeding that would be subject to seeking one of these waivers. But we absolutely do expect there to be facilities in both regions. There's evidence about this before FERC about this. If you look at JA-122 through 25, JA-137, 38, there were declarations from both Midwest and Sunflower explaining why they expect there to be future facilities in the very near term that would satisfy this criteria. And so you're right that it's a right to apply for a waiver. We're not guaranteed to get one, but with the extremely narrow discretion that now exists under the amended version of this tariff amendment, it's pretty clear. You'll be able to figure out if you satisfy the criteria. If you just take the example of what happened during the nine months that this tariff amendment actually was in place, only four facilities applied. The Sunflower facilities are the only ones who applied. And if you wanted a reallocation, you had to apply during that because there was 180-day clock running once the tariff amendment went into place. And so once people had a chance to have this in place and look at the criteria and figure it out, there wasn't this enormous universe. There's more than 1,200 facilities in the STP region, and only four of them thought they could satisfy this criteria. And as you can see from those separate orders, they satisfied it kind of running away. It wasn't even a close question. And so given the way the tariff amendment works, after the specific requests that FERC made to modify it, it says that STP's board, the only thing it can base this decision on is whether the three criteria are satisfied. So if they're satisfied, you're getting a waiver. And if they're not, you're not. And if you don't get one and they are satisfied, you're going to have very powerful to a six application to FERC saying that the board didn't comply with the terms of the On the jurisdictional questions, I understand you don't represent SPP, but do you think there's an argument that SPP is differently situated? I mean, it seems like they are the direct object of this order and in a practical sense, we're reviewing an order that removed an authority from SPP. Absolutely. I think that SPP has standing independent of petitioners here and that that, of course, is sufficient basis for this court to resolve this case if you had any doubt about petitioners, because of course, SPP has an interest in its authority under its own tariff. It is, as you say, the object, I mean, it's the object of FERC's action and we are the objects in the sense of how the tariff operates because we're the members of SPP who are going to pay the costs under the cost allocation. So if, you know, neither SPP nor its members have interest in how it allocates costs, I'm not really sure how this court's ever supposed to be reviewing determinations about what the terms of an RTO or ISO's tariff are. And really, if you look at cases that have raised standing concerns, they haven't been in the context of people challenging or defending amendments to the tariff that applies throughout the region. They've been in the context of more specific, you know, things that only affected one facility or in the context of things where you didn't have final agency action, dynamics like that. This court has long reviewed cases where the members of the region and the, you know, the RTO or ISO are the parties who are here defending the tariff or the challenges to the tariff or, you know, attacking the tariff. In looking at those cases, it seems like the RTOs that have standing, they can point to not just that they were the object of regulation, but that there would be some cost that they would incur due to regulation. Well, usually the cost is actually going to be borne by the members because, you know, the RTO or the ISO is just sort of setting the rules of the road about how the costs throughout the region are going to be allocated among members. So, in the petitioners, my clients are absolutely facing the costs because... And that's been passed on to the rate payers? That's right, yeah. So, ultimately, you know, all of this is about who's going to, you've got the entity who wants to be able to make the decisions about who can pay the costs, and then you've got the parties who actually have to pay the costs. So, between us, we've basically got the universe of interested parties in this amendment. And if you can't kind of challenge this now, there's no way to do it because if you have to wait till you have a particular facility, sure, we could have, you know, try and get SPP to file a separate 205, but we're not going to be able to challenge what happened in these orders, which is the denial of SPP's effort to amend its tariff. Why is this cost allocation issue not better addressed through the CIR process? Yeah, FERC itself rejected that argument in the approval order, and it never resuscitated it in the reversal and rehearing orders. So, I don't think it's actually, I think there's kind of a tenery problem with respondent interveners making that argument, but as FERC... So, this is not the same as the ex-ante? There are separate issues, yeah. So, the RCAR, I mean, FERC explained this a lot more in the separate 205 proceedings where it's a little bit more at issue, and in that rehearing order they submitted to the court a couple weeks ago, it talks at a little more length about the RCAR and how it's just like a different process. It's not designed. It's at a higher level. It's at a zonal level rather than a facility level. It's done at kind of a point in time. And so, it's just not designed to deal with figuring out whether you have specific transmission facilities as to whom the costs that are being allocated face a cost causation problem. And so, this argument, respondents have pressed this argument all throughout the proceedings, and FERC consistently rejected it. It's not one of the two narrow grounds that FERC offered in its reversal and rehearing orders for rejecting this. Now, FERC did reference the ex-ante issue in its orders, and I don't think that works for a couple of reasons. First, there's no ex-ante issue at all as to the going forward tariff amendment. The whole point of this is to, consistent with the ex-ante principle, say, let's change the rules now before new facilities come online. That's what ex-ante is all about. And so, to the extent there's any ex-ante. This is a little unclear to me, but ex-ante could be before the construction of any new transmission, or it could be at the time of the overall regional planning process. And I take it you're arguing the former, and that otherwise you can't have a tariff. Right. Basically, I mean, you have the ex-ante, the concept that order number 1,000 back in the day when it said you should have this was getting at is, let's set rules of now that will govern all facilities as they come online so people know the rules as they're thinking about transmission planning for the region. And so, that's what the principle is basically saying, is have the rules of the road in place before facilities are coming online. So, to the extent what this amendment's doing is dealing with those future facilities, it's far from posing an ex-ante problem. So, what about existing facilities? Now, the question is, as the existing facilities, and what FERC has explained here and also separately in the 205 proceedings, is ex-ante, I mean, it's not a rule that says you can never change the allocation of existing facilities. And as FERC put it in the rehearing order that it submitted just a few weeks in the separate proceedings, it couldn't be a rule that says you can never change the reallocation because then the ex-ante principle would be in conflict with FERC's mandate under the FDA that if rates are not just and reasonable on a forward-looking basis, it needs to change them. And so, we're not talking here about any retroactive changes. Nobody's trying to reallocate costs that were already paid to change anything that has already happened. This is just a question for those existing facilities of whether the remaining costs that haven't been paid yet should be allocated differently. I guess I think FERC would say that they were making a little bit of a softer point in their it's both large in scope and it's at least in tension with the ex-ante principle to the extent it would allow RTO to have the discretion to change the rules of the road for an existing facility. And to that extent, maybe you would say that's not sufficient, but is that at least not coherent on its face? I mean, I suppose that's probably the best understanding of what they're trying to say. For one, it makes absolutely no sense as to the forward-looking issue. It just doesn't, you know, because at that point, you're saying we'd rather not have the tariff reflect what we're going to do and we're going to deal with this in a one-off situation, which is contrary to it. As to the existing facilities, I think it's just not consistent with FERC's approach generally to all this and not consistent with the approach FERC took now in the separate proceedings where it said this isn't some hard and fast rule. And if ex-ante meant you could never change the allocation at all, never have any reallocation, the ex-ante principle would be even more aggressive than the filed rate doctrine because you're allowed to change on a going-forward basis rates under the filed rate doctrine. Well, and FERC approved the allocation with respect to the only ones that are, as you say, arguably ex-ante. Exactly. And it dealt squarely with this in those separate orders and said this isn't a problem because ex-ante is not a hard and fast rule that says you can never change allocations going forward. And it specifically said, which I think is absolutely right, that to the extent you were to interpret ex-ante that way, that principle, which is just a planning principle in a FERC order, would be essentially overriding the mandate of the FBA that you can't, you know, you have to change rates when they're not just and reasonable and when they pose a cost causation problem. So I don't think there's as any, I just don't think the ex-ante argument really gets them anywhere and the two can... Can I ask about one of two different metrics rationale. FERC doesn't make that argument, but the interveners do. And I'm wondering, apart from the fact that FERC changed course, what is your argument that the possibility that multiple metrics would be used couldn't lead to discriminatory results? The problem with that argument is there's nothing discriminatory about either of those options. They're both, as FERC said in the approval order, they're just two metrics that FERC itself has recognized are permissible ways to demonstrate what kind of the costs and benefits throughout the region are. And so... But it does raise the possibility that two otherwise similarly situated applicants would have different results if the metrics pointed in different directions. Well, I mean, the metrics... I'm not sure there's going to be a situation where the metrics kind of point in like completely different directions. I mean, essentially what seems to be contemplated is, look, you can put forward one or you can put forward two. I suppose somebody who's opposing it might try to say you put forward this one because you don't satisfy that one. But I think the point that the FTP was making in the tariff is, look, these are two metrics that FERC itself has repeatedly accepted as permissible metrics for figuring out if allocations are consistent with cost causation principles. And so accepting the same metrics and saying either one of them is going to get you to the same place just doesn't seem to be the kind of thing that... Sure, I suppose you could say there's discrimination in some sense. But as this court has put it, the FTA requires undue discrimination. So you'd need to be treating entities differently that are really completely differently situated, not just it's a little easier for us to show it under this metric versus that metric. One of the difficulties for me on this specific issue is that nobody seems to explain whether these metrics are ever going to lead to different results. FERC seems to assume they will. Your side seems to assume they won't. And one view would be we hold that against FERC for not explaining further. But another would be we hold it against you for not explaining why FERC is wrong. Yeah, and I suppose you anticipated what I was going to say, which is I would urge you to take the first path, which is that if FERC thinks that's a problem, it needed to explain it. All it did is say there's two different metrics and so therefore that's a reason to reject it. I don't think that's sufficient. FERC has an obligation to explain why using two metrics that are FERC-approved, metrics FERC itself has used in the past, is somehow going to pose some big problem. The mere fact that you can look at two things, I mean, that in itself can't be the reason for rejecting. And it's also completely inconsistent with how FERC has operated when it comes to other terms of STPs tariff that allow for the exercise of discretion. Because if you look at both the base plan, base upgrade plan waiver process, the transmission waiver process, the two that we talk about in the briefing, those don't even require, they don't limit the criteria the board can consider at all because they explicitly say they can consider what's in the tariff, including but not limited to what's in the tariff. So for FERC to say, you know, you've got this, you've set up this process that actually is way more constraining, but we somehow have a problem with you saying that you can prove it two ways, when in the past they've said we don't have a problem with like any way you want to try to prove that you're entitled. I think they run into lack of reason explanation and a departure from their own past precedent. So I am struggling a little bit with the, I think the same thing that Judge Garcia is struggling with, which is sort of bringing this down to a concrete level. So if there were two identically situated facilities and they both thought, okay, for us, the benefit, we're going to show that the first of the two benefit criteria, that's the showing that they make. And they don't turn to the integrated market criterion. So what if FERC says, okay, facility A has met that. Facility B, we're going to consider facility B only whether it's met the integrated market criterion. Is that possible? If not, why not? I think that would violate the terms of the tariff amendment, as I understand the tariff amendment, because the tariff amendment says the board has to, the only thing it can look at is whether the three criteria are satisfied. And the amendment specifically says as to the third, benefit criteria, that you can satisfy it through either path, only those two paths, but through either path. And so if SPP's board has an application before it, that satisfies the first criteria, the second criteria, and one of the two ways of satisfying the third criteria, I don't think it has discretion to say, well, we're going to make you prove it the other way because the tariff amendment specifically says that either one is sufficient. And so I think it makes clear that all you have is just two different ways of trying to prove the same thing. And owing to all the transparency that's built into this process leading up to the board's vote, you're going to have a very complete record to understand what the board was looking at, what evidence it had, whether it had a good basis to conclude that the criteria was satisfied. And so I think all that goes back to why the discretion concerns for grades just really aren't grounded in reality since the tariff amendment explicitly says that the only thing that the board can base its decision on is whether the criteria are satisfied. So if the board's doing anything else, it's violating the criteria and somebody can file a 206 application and challenge that. I want to make sure I understand your position on the cost causation problem in 206. So am I right? You're not disputing, but generally, it's decisions whether to initiate the 206 proceeding are unreviewable in general matter. Instead, you think there's something in this record that is sort of an affirmative finding that the existing method is unjust and unreasonable and that triggers the 206 obligation. I think it's a product of the kind of unique procedural history of this that you have FERC having made a finding in the approval will better align the allocation of costs here, that this is the better way to do it. And you think that's tantamount to an affirmative finding? I think it is. And I mean, FERC has certainly not taken issue with the proposition that the rates that would be produced under the waiver are just reasonable. I take them to be conceding that and to really only be arguing about a risk of undue discrimination. And I think when you look at that history of them having acknowledged, encouraged, said, you know, we get it, there's an issue here, you need to address this issue, to then at the end of the day, just kind of throw up their hands. I mean, even just as a procedural matter, it seems like there needs to be more explanation as to why after encouraging this very lengthy stakeholder process, they just kind of say too bad. And I find, you know, I mean, the notion that you end up in the rehearing order with one of the commissioners writing separately to say, why don't you consider a stakeholder process? I mean, my goodness, there was a six-year stakeholder process. Like, that's what this was all about. So it just, under the circumstances of this case, I think that what FERC had to offer about 206 just isn't enough to explain why. Certainly the compensation principle is, you know, it's helpful to your clients here, but it's not, it's a rough, and it has to be a rough principle. There's a lot of, you know, cost sharing to people who are not enjoying the precise benefits that the cost they're paying go to. And, you know, that's just the nature of an energy system. That's absolutely right. But we're not talking here about a cost causation issue at the margins. The evidence before FERC was that ratepayers in the Sunflower and Midwest zones are paying as much as two to even more than three times more than ratepayers on average are paying in other zones in FPP. Do we know how much of the additional expense, I saw your brief, your blue brief, you say Midwest Energy and Sunflower customers face 2022 by-way costs of $814 and $1430 per megawatt month, respectively, compared with a load-weighted average of $427 for other FPP zones? Page 12 of your blue brief. Do we know how much of the additional expense is due to the fact that facilities in these zones transmit wind energy regionally? Well, I think that's basically what the criteria that FPP established were designed to kind of ferret out. So, what they do is they start by saying first you need to show that you have a way higher volume of generation in the zone than the zone itself uses, than is needed to serve local load. It's like 100 percent higher than the previous year's needs. So, that's where you start by identifying zones that have just a high, high volume of generation that is serving the rest of the region. And then the second criteria, the flow criteria, looks at it at the facility level and looks at it about what's actually flowing over the transmission lines and asks is there a high, high volume there of transmission of energy that is coming from that unaffiliated load within the zone, from the load that's not serving the local load but is instead independent wind generation, whatever it may be. And so, those two criteria are designed to say, okay, look, basically what the stakeholder process was about was saying we know these costs are higher. Let's figure out why, and let's figure out in what circumstances we need to address that problem. And so, those two really narrow it down. And once you take those two criteria, you have narrowed it down a ton. There's only three zones out of 18 that satisfy the first criteria, and two of those are Sunflower and Midwest. Once you get to the second criteria, you're down to 36 facilities of existing facilities out of more than 1,200. And then when you get to the third criteria of those 36, only four sought a waiver. So, it's because the way these criteria work is to say let's not just assume everything in that zone is incorrectly allocated. Let's find the facilities that actually seem to be serving a much more regional purpose and reallocate costs as to those. And just to be clear, I mean, even with the reallocation we're talking about, which is to reallocate their costs 100% regionally. That doesn't mean Sunflower and Midwest customers pay nothing for those facilities. They're part of the region. So, they just pay a regional cost allocation instead of having to bear the brunt, the two-thirds cost that they currently do under the byways. Are there other facilities other than Sunflower and Midwest who could have but didn't make the application similarly situated that just didn't have the brainstorm and would be closed out? Or there's a window for existing facilities and then, as you say, there's going forward any new facilities can benefit. Yeah. I think as to the existing facilities, kind of the logical inference and the inference that's consistent with my discussions with folks about this, there's nothing directly in the record about this, but is that they just determined they couldn't satisfy the third criteria. Or maybe there's a handful where they just had very little life left on the project or something like that. But more likely, I think there were just some, the third criteria is a separate criteria and each of these criteria kind of winnows it down a little bit more. And so, they just were determinations that even if the first two were met, they couldn't satisfy the third one. And I do think that goes to show this notion that on a going forward basis, you're going to have some explosion of facilities that are applying for these waivers and qualifying for these waivers. It's not consistent with the record evidence, but I would note that to the extent there really is some concern that there'd be a lot of facilities, that's hardly a reason to reject the amendment. If you think there's a substantial number of facilities whose costs are not really being allocated consistent with their benefits, that wouldn't be a reason to say, let's leave it alone because if anything, that'd be a reason to say maybe we need a broader solution. But I think the stakeholder process revealed, this isn't a, you know, it's not a problem with the highway-byway methodology on a whole such that the whole thing needs to be reconsidered or thrown out. It's just a small problem that is serious where it occurs, but isn't, you know, it's a small number of facilities and that's why SPP came up with what it calls a surgical response to all of this. Speaking of the highway-byway system, there's another sort of basic facty question. Why is it that producing excess wind power doesn't require high voltage, whereas producing excess power in more traditional ways does? It's actually more just the nature that these zones where it's occurring, they had pre-existing transmission before they became these very, you know, big sources of wind generation. And the pre-existing systems there are byway systems, so they're not huge zones. And so you kind of work with what's already there. And so you're going to have upgrades to byway facilities, your connections are going to be to byways. So it's more just a matter of like, that was the existing infrastructure in the particular zones that ended up kind of unanticipatedly being these very high wind-rich zones. Now, you know, I suppose... If you started from the beginning and you were building a place where there's a lot of excess wind generation, would that be a place where typically there would be some highway? I mean, I might think like, you know, my sense is that seems like it might make sense, but it's probably all going to depend on a lot more than just that, because you got to look at the nature of the area, the grid, all of those things. But, you know, to the extent in the future there were a determination that you needed some highway facilities in these zones, then this whole thing drops out because the highway facilities are already allocated regionally. I think I know the answer, but who determines where and whether to build additional wind power? So the generation is not... That is determined by generators and understate policies and all of that. So we, as the transmission owners, have basically no... We're not deciding what generation is going to be there. We're agnostic as to what's there. It's not kind of our doing that there's a bunch of wind there. It just happens to be there, and we have the transmission facilities, and so we're stuck paying for it. And who determines where and when to build new transmission facilities? So the transmission planning, the transmission planning not for SPP is much more involved in determining what the needs, as long as you're talking about things that are part of the grid. So it's going to be... And that's why we can't kind of just like tell the court, oh, we're going to build some new transmission. We don't get to decide. That is a planning process working with SPP to determine where it thinks that needs are for upgrades and additional facilities and all of that. But that's why I think some of these, you know, to the extent what was really going on underlying in these proceedings was some concern about like spreading the costs of wind generation and that being unfair. I mean, we didn't set the policies and neither did SPP to have a bunch of wind generation in these zones. And to the extent any of that is driven by policies of states, like the whole point of the cost causation principle is all that sort of drops out. And the ultimate question is who's getting the benefits and who's paying the costs? And whatever decisions may have been made by others about what energy should be generated where, we're paying an outsized share of the costs without this amendment in place and without the approvals that FERC has made in the separate 205 proceedings for the existing sunflower facilities. And does the cost allocation scheme, like whether, which comes first, highway byway cost allocation or selection of facilities as part of the regional transmission? So the highway byway methodology has been in place in the tariff. So I think it was like 2010. There were some different things before. The selection of something as highway. So it's just dictated by the voltage of the facility. So yeah, so once the Detroit, so the decision is made in the planning process about what kind of facilities you need, but basically by default, the voltage of the facility is going to make it either a highway or a byway facility. And that's going to dictate its costs. And so that's why absent this amendment, just by default, just by virtue of being under 300, and 300 is the threshold to be highway versus byway, our costs would be allocated two-thirds to the local zone and only one-third to the rest of the region without the amendment, which allows the complete reallocation. And how often is there STP regional planning? Yeah, I don't actually know exactly how often they make the planning determinations. FERC may be able to tell you that, but there's constantly trends. I mean, it's not just a matter of new lines. It's also upgrades to existing lines. So there's a lot of changes happening all the time, and especially a lot coming online in these regions that are, that drove this problem precisely because they have such a high volume of generation as compared to the local needs and the local grid that was set up to serve them. Okay. Thank you. And any other questions? Thank you. Good morning. I'm Carol Dancif for the commission. And I do want to talk about standing, but I think I'll begin with just a quick discussion of the 205 versus 206 questions. We can't refer to the allocation orders proceeding as the 205 proceeding because this is as well. Every order in front of the court, the rejection order from the previous proceeding, the three orders from this proceeding, the two orders in the allocation, all of these are 205. There has not been a 206 complaint by petitioners or I believe anyone else challenging the existing highway byway cost allocation, which has been in place since 2010. That is the lawful rate. It was approved or the lawful tariff cost methodology. It was approved by the commission then. It is still in place. It is still just and reasonable until the commission decides in a 206 proceeding that it is not. It has not done that and hasn't even been asked to do that. In these orders, in the tariff order in particular, and then in the allocation orders, the commission did agree that reallocating the cost of some of these facilities outside that cost methodology might better align the cost. That's true. But as Judge Dillard, as you said, cost allocation is rough. It is roughly commensurate. The Supreme Court long ago referred to it as a zone of reasonableness. Just because it is true that a better alignment of these costs is just and reasonable as the commission found in the allocation orders, that doesn't mean it is the only one. In fact, if the commission said there is a better way, therefore the existing way is not just and reasonable, we have been reversed by the court for doing that in a case called the Merrimain. The commission, just because there might be a better way doesn't mean the existing way is unlawful. Just so we are clear that the existing cost allocation methodology continues to be just and reasonable and that these are both 205 proceedings. Can you explain why applying the tariff amendment would violate the ex-ante principle? The commission's order denying re-hearing says that SPP's proposal would provide the SPP board with the discretion to change which cost allocation method applies to specific by-way facilities after they have been selected as a by-way facility. What is not ex-ante about it if we are talking about facilities that are being constructed going forward? You will basically have three categories. A by-way facility that is charged to local zone, a by-way strength or voltage facility that is charged zonally, and a highway voltage facility that is charged zonally. What is wrong with that under the ex-ante principle? The ex-ante principle, which comes from order 1000, happens pre-planning. The idea is if you have these rules in place, cost allocation in place before planning, then the planning can be driven by knowledge of who is bearing the costs and who benefits. That goes to what order 1000 was designed to address, which was that facilities were not being planned because there were not rules in place and the people or the entities considering the planning could not see into the future who was going to have to pay for them necessarily. That is where the principle in order 1000. It is true. I think the commission in these orders, considering this discretionary process for SPP to decide cost allocation, the commission focused on the ex-ante aspect, I think with respect to the concern about reallocating existing facilities. I don't know that the commission was really speaking to the concern about potential future facilities that had not even been planned yet, but there very much was... That is going to the other 205 proceeding that is not before us. No, but they were... They were parties here, but... No, not just that, Your Honor. I'm sorry to interrupt. I interrupted you. I apologize. The process that SPP proposed here was going to allow reallocation of existing facilities. When it proposed that, it didn't yet have... Maybe this is the only application that was submitted for an existing facility, and I'm not sure that the commission didn't really discuss the 18 months, whether that was an all-time limit that no one else could ever come in. If, in fact, as the petitioners contend, this process will help going forward as new wind energy is built, I don't understand why the owners of existing facilities wouldn't be seeking reallocation when that happens, just as Sunflower did. But the process that SPP proposed did allow it to reallocate for existing facilities in addition to whatever it might do for future ones. So that's why the commission discussed the ex-ante concern that you would be changing the rules of the road through this process. And that was only one of several concerns. One place I'll point in on JA501 and 502. In paragraph 37 of the second rehearing order, the commission really kind of summarizes the several concerns that together it found it couldn't approve this process. One was the discretion, the amount of discretion given to the board. One was the concern about undermining the ex-ante cost allocation method. One was the scope because, sure, maybe not every facility would actually be able to meet the test, but the eligibility was open to numerous facilities region-wide and not inherently limited the way a couple of other processes that SPP already had were. And fourth, the concerns about transparency because the board wouldn't have to articulate its reasons. So this is where the commission puts all those things together, so ex-ante was one part of it. Now, when we get to the allocation orders, we just focus on ex-ante for just one more second. I think what petitioners would say is something like these orders treat that principle as if it's inviolate. And in fact, it's not and can't be as your recent orders and the other proceedings show. And that's what I was about to... Right. So why it seems a little bit inconsistent. Well, here it's one factor. And again, this here we're letting the SPP board make the decision without going to FERC. So it was one of the factors, in addition to the others I just named, that the commission found concerning because it would undermine the certainty of ex-ante cost allocation to change it later. But that really... I mean, and that's what I thought FERC was saying. The ex-ante is really subsidiary to the concerns about transparency and discretion. If transparency and discretion are really fully resolved, then FERC in approving the tariff amendment has given its blessing. And the SPP is then legitimately exercising its role in determining which facilities meet the standard. I don't think the concern about ex-ante... I don't think that answers the concern about ex-ante because if the commission approved this SPP process, they would be changing the allocation of existing facilities, and it would undermine the certainty of... When you're at the planning stage and you're thinking about what facilities to do, and you look at the rules of cost allocation, who's going to pay for them, and that goes into the decision of who supports building the facilities, et cetera, and then that is changed later. It does undermine the certainty that was the point of Order 1000. So can you be more concrete about that? Because as I understand it, what's happened is there was approval of certain highway facilities and certain byway facilities with the understanding that zonal service, most of the zonal transmission was going to occur under highway facilities, through highway facilities, and most of the more, did I say zonal? The regional would go through the highway facilities and the zonal would go through byway. Then when you get up and running and the byway facility is being used for zonal distribution, it would seem that the even more fundamental ex-ante principle is that those who benefit roughly should be those who pay, and when that's really out of kilter, the very assumption behind selection of some as byway and some as highway is no longer really accurate. Well, I don't think the Commission has answered that question, because I don't think that's how the Commission would look at it. The Commission would look at the facts that change this to that facility, and that's where we come to the allocation order, and the awkward thing, as we've said, these orders should be considered together, because if petitioners are arguing this case about the cost causation and the cost allocation issue, it's not even in these orders, because, but let me explain to you what the Commission found in the allocation proceeding, because hence there, the Commission itself is approving a reallocation of the costs. It's not something that the SPP board is doing on its own. This is a section 205 filing. You're talking about the other case. The other case. Well, they're all, yes, exactly, that section 205 filing. The other petition that's not before us. Exactly. For the four. For the, exactly, which, since the hearing order has done that, we'll move to a briefing soon. We've asked to have the abeyance continue to February 4th, just so we can get any more petitions for review in. But you were going to say, in the allocation proceeding, when you first did. So when the Commission is looking at it itself under section 205, then, of course, some parties said, well, what about what you said about ex-ante cost allocation? And the Commission didn't disown ex-ante cost allocation, but it said that's a policy. Order 1000 is a policy. But when you come to the Commission itself with a section 205 filing, and you make the showing that your proposal is just and reasonable, and that it's rough, that the cost allocation, the benefits are roughly commensurate with the costs, we have to approve that under section 205. And the fact that it would undermine certainty with regards to ex-ante, that's a policy, and the policy cannot override the statute. So when the Commission itself is making the decision, then the ex-ante becomes a secondary concern that doesn't win the day. But here, we're not talking about the Commission making a rate determination. We're talking about the SPP board making the rate determination. So the Commission's ex-ante policy, it did find it one of several factors, not the deciding one, not the only one, but one of several factors that listed for why it had concerns about the discretion given to the board. Why do you say SPP now FERC is making the rate decision since it would be FERC approving its tariff as it initially did? That is FERC. But it's not a filing made with the Commission to reallocate the costs. It would be allowing... Tariff systems were always sort of the formula, the principles, and then... It would be approving a process. And I think that's just why the Commission treated it a little differently with regard to the concerns about ex-ante. It has the same concerns throughout, but it finds they're overridden in the allocation proceeding because it can't deny the Section 205 filing by SPP to reallocate the costs on the basis of a policy when it meets the standards of the statute. I have a question. And again, if I have all the orders... I probably should ask this of Murphy too, but if the byway facilities are already constructed and they were constructed on the assumption that they would be serving zonal load, why is it that there are higher expenses associated with regional transmission over facilities that were built and budgeted as zonal facilities? I guess it's sort of the inverse of the question I had for Ms. Murphy about why is it that traditional generation, fossil fuel generation, tends to do zonal service through highway, whereas these wind facilities are serving the zone through byway facilities? I'm not sure I completely understand the question. In the blue brief, there is a discussion of how Midwest and Sunflower customers are paying much higher byway costs than other zonal customers. I guess I'm just wondering if each byway facility is just constructed as a 300-megavolt facility, why would it become more expensive if it's been used for... It is not my understanding that it has become more expensive. More byway facilities there in order to... I think, and I don't want to speak for them, but my understanding of the issue isn't that I don't think it's that they have more costs. Although maybe more byway facilities are being built to accommodate that generation, that's possible. But certainly they're saying of the costs of that facility, we don't think the people in our zone should be paying 67% of it because... Right. That's common. Unless more are being constructed because the need for more interconnections, that might be it. But if it's the same byway facility, I can't imagine it gets more expensive when it's connected to... I think I'm getting this very well. Yeah, I'm kind of guessing in that regard. I do want to touch on the benefit criteria point. To be clear, the commission has not abandoned that argument. It's not only the interveners that made it. The commission in the orders in the first rehearing order, paragraph 52, I believe, and the second rehearing order, paragraph 41, talked about that. And it is true, as it said in the tariff order, that both of these metrics are fine. The commission itself has approved rate filings based on both metrics. So the commission said it's fine to use one, the other, or both. The problem, as the commission described it in the two paragraphs I just cited, is not that they're inappropriate to use, it really goes to the board's discretion and the transparency question. Other parties need to understand what was the deciding factor, which criterion or combination of the two criteria mattered in this case. Because you need to... That concern would make sense if we had a reason to believe the two metrics would sometimes or often or maybe point in different directions. But if we don't know that... Well, I think the reason the commission has seen them both is because parties will sometimes do one or the other and not both. So I don't know that we have the data on if you meet the first one, do you always meet the second one. It's more of a flexibility in how can you prove your case. Both of these prove something. I would really appreciate more clarity in terms of concreteness, the specific case you're imagining. Because if you have two different parties who have made the same kind of showing, I can't imagine a situation in which the SDP would treat them differently. For example, if both of them say, we're only going to do the integrated marketplace and they only make a showing of that. I mean, it would be arbitrary for and violate at least what we do when people make showings. We don't say, well, you made that showing, but we wish you'd made this other one. I mean, I don't think that's a case in which the SDP would treat them differently. So maybe one makes both showings and the other only makes the first. And if the first is inadequate as to both applicants, and only the second makes the case, then people have made different showings. So the one who made the more robust showings should prevail in a way. There's nothing arbitrary about that either. Well, for one thing, we don't end up knowing what was decisive for the board. What did the board think? What they've submitted, because you've had all this public- Know what was recommended to them. Know what was recommended, what was in their application. You don't know what they were persuaded by, ultimately, and they don't have to explain it. So the next party that comes along is not able to say, that utility showed X percent under this metric or Y percent under this metric, and so do we. So we should be treated the same. They can't even make the case because- Because what they proposed is public. So black box or not, you can say we were similarly situated in every respect, and we got treated differently. That would be a very strong 205 petition, wouldn't it? It would be useful, but I think that the commission here was just the final decider can't be a black box. I mean- I'm not following, and it would be really helpful if you could explain sort of a situation in which there's this kind of showing, and then a similarly situated applicant makes the same kind of showing, just treated differently. I just- I'm having trouble even envisioning this coming up. Well, I think the problem for the commission is that in approving the process, it has to- The commission didn't think it could allow a process where it was theoretically possible. We don't have a concrete example because we only have one entity that went through this process at all. Let me see that kind of algebraic, concrete hypothetical. And I'm afraid I don't think we have that because the commission likes to be flexible in how parties can show benefit, and that's why it has allowed different metrics in different cases because that's what the party brought, and the commission was able to look at it. But in setting up a flexible process where the SPP board could consider one or the other, or both. Say you don't quite make what the commission might have allowed under metric one, or quite what the commission might have allowed under metric two, but you think you can make a case based on both of them. You're allowed to do this, but we need to understand what happened so that the next party that comes along can understand what happened. So let me just ask, you're not asserting that the board would review an application under a methodology that the applicant didn't use, but they would review the showing that the applicant made and the applicant's choice. Well, they might have multiple showings in the recommendations. They have, but that's why I'm asking. But they wouldn't say, oh, you've used the first methodology, and we prefer to look at your application under the second. We don't know. I mean, there are... Is that a possibility? As written, yes, I think so. And again, the commission may not think that's actually going to happen, but the commission is being asked to approve a process, an open-ended process that might be different in different cases. And if we're talking about extended into the future, the commission has a responsibility to make...to judge the process itself. Right. So if it had said the APC methodology is preferred, so everyone has to try to show that. And if you think either that that may be inadequate or that you also want to use the integrated market methodology, you may do that. Would that create the undue discretion if you have a clear one-two priority so that we know everyone's being considered for whether they clear hurdle one, and then if they've chosen to show... I think, ultimately, we just don't know what the decider thought of it. It's as though you went through an entire commission proceeding. Our whole docket is public, except for rare exceptions of something that's privileged for some reason. The whole docket is public. Maybe we have technical conferences that are public, all sorts of filings by everyone. And then the commission does an issue and order. Now, we don't have that option because under the Administrative Procedures Act, obviously we have to. But you could say the entire commission process was public, and all the suggestions that were made, all the evidence that was put in, everything was public. But the commission vote took place behind a closed door, and we didn't issue a written decision. I mean, that's the difference. When the commission makes a decision like this, everyone can look at it, and we can come to court, and people can say that we're wrong, and the court can decide whether we were arbitrary and capricious. The next party that comes along can cite that as precedent and say, well, in that case, here's what the commission did. It's open. It's transparent. It's explained. Did the SEC board vote by secret ballot on the base plan upgrade? Yes. And on the transformer waiver process? Yes. And why wasn't that an issue? Well, the way the commission explained it in several places, and one actually is before this proceeding, in the previous, in the rejection proceeding, so it's at J34, but then it also said the same thing in our orders, and it talked about the base plan upgrade waiver process and the transmission waiver process. They both have, the commission said basically that it's a matter of scope, both the number of facilities that might be affected and the amount of costs, because we're talking about potentially a number of facilities, and they're pretty large facilities, even byway facilities are not small. So it's a lot of costs with the base plan upgrade waiver process and the transformer waiver process. They're both inherently limited by who's even eligible to think about it. The base plan upgrade waiver process has something to do with a review that SPP does that comes up with a very small universe of projects that are affected. So the commission said it's limited in scope. The transformer waiver process narrowly pertains to dual voltage facilities. They're necessarily limited because there aren't that many dual voltage facilities, and it's obvious to everyone what they are, and they tend to only be in certain places where one voltage meets another. So the commission said there are significant restraints on the scope. And again, that goes to the paragraph I had mentioned earlier in J501, 502 of the different factors, including the ex-ante issue. The commission again cited scope. The difference is scope. Why doesn't everything you just said apply to this? If we went through this and we learned that of all the many facilities, four thought they were eligible. Well, because we're talking about a process that any byway facility could apply for. Maybe they wouldn't all get it, but we're also extending it into the future. And they're larger and more expensive than these dual voltage facilities we're talking about under the transformer. So it sounds like today it was something like 1% of facilities thought they could apply for a waiver. So going forward, 1% of all new facilities apply for a waiver. Just doesn't sound like... Well, we don't know that. Because the eligibility is more open than that. That may be how it plays out in practice, but the commission is having to approve a process that would be in place, even if it turned out that that was wildly wrong and it was many more. So the commission is very much looking at the process. And again, it's up to the Southwest Power Pool to determine where and when new generation can be filled. Not generation. New transmission. Transmission. Yes. Not the generation. The generation is driven by companies making their own decisions and then asking InterConnect and then SPP and its various members respond to that by building the transmission facilities. But CERC would have no concern if, for example, a wind field were constructed and SPP said, okay, let's build a highway transmission line from there. I mean, if they went through their planning process that's in their tariff, we have no reason to question that if they did it according to their process. Yeah. And in terms of the other two waiver processes, timing of those and any anti-concerns that they raised, why are they different? I don't know that I don't know as much about those processes, candidly, and I think that they, I don't think they involve existing facilities as I understand them. They are facilities that are going to be built. If I'm wrong about that, it's just not in the orders, but the way it's described in the orders, it does seem to me that it's something that happens at the outset and not something that happens later. I had assumed otherwise because they're referred to as other waiver processes. And again, waiver is a tricky term, but I mean, even at the planning, you have something that's designated as highway or byway at the planning stage. So my understanding would be these would be saying, okay, we look like a byway because we're 100 to 300, but please treat us differently because we fit this category. That's my understanding of how those, because again, if I'm wrong, I'm not aware of something in this record that discusses that. So that was my understanding. Do you know if there's any decision for which FPP does have to issue a written decision and explain its rationale? Well, I mean, I don't know, but no, I don't know of one, but also it's, I mean, what was unusual here is that they don't usually determine cost allocation.  So I think to the commission, that was the difference because we do have this section 205 responsibility to have cost allocation decisions be transparent so that you don't end up with disparate outcomes. And nothing would stop FERC if it wanted to, if it thought this scope was going to be a problem, it could open a 206 proceeding and address. It has the discretion to do that, but yeah. I know nobody can force you to, but I mean, in terms of the concern that, you know, maybe we're going to have a whole, you know, we're going to upend the assumptions on which the planning was conducted in the first place. Right. And I mean, the FPP isn't here to speak for itself, but I would think if there were many, many facilities that were actually applying for this, you would think that they would revisit their own cost allocation methodology. But yes, the commission would have that power. And that brings me, I do just want to make a couple of points about standing, because of course, FPP did not petition for review. This is FPP's tariff. So, if there were a party that was the object of this proceeding. Aren't they an intervener? But they didn't seek review. So, I'm just saying, if we're talking about standing. We have cases, including one called Ameren, in exactly the situation where the RTO comes in as an intervener, and we find they have standing, we don't even need to address the other, the actual petitioners. So, do you have an argument that FPP lacks standing? Well, we don't know, because they didn't really, they didn't talk about harm. I mean, they're the object of the proceeding, but that doesn't necessarily mean that they incurred an Article III cognizable harm. But, I mean, they weren't even given argument time to explain, so I don't know. But, so the argument we made on standing, I mean, the clearest argument we made on standing is just that this court has been saying in numerous cases for a couple decades that you have to explain it in the opening brief. And the court has had cases where it said, you didn't explain it in the opening brief, we're not going to let you do it later and make up for it. So, the- But you're, I mean, all your arguments about the potentially tremendous scope of this and the disruptive potential of it, that seems to at least undermine the standing concern. There's a lot of import to this going forward. Well, there could be, but we don't have any explanation of why these petitioners were harmed. And interveners. It didn't, I mean, it said that it was its tariff, but that could be. But, of course, the only, as we've discussed, the only facilities that anyone applied for, at least when this was in effect, have been reallocated by the commission itself. And given how much discussion we've had of the cost causation and the roughly commensurate and all of that, at a minimum, if the court were going to delve into those issues, we really should do it when all the orders are before the same court, consolidate all the cases. Because this is the process side, and that- You didn't file a motion to consolidate, you didn't file a motion to hold this case in abeyance. Well, we proposed a motion for abeyance to the petitioners, and they wouldn't consent to it. And since briefing was already underway, we knew that the court would defer it to the merits panel. We didn't think that filing an opposed motion when briefing was underway would be a useful exercise. So we proposed in our brief that it should be in abeyance. Because, yeah, the first allocation order did come down after they had filed their opening brief. So briefing was already underway. But we certainly would support consolidating them. And we did want, in late July, early August, we wanted to put it into abeyance then, before the rest of us filed all our briefs and the court took its time today. But we couldn't get agreement on that. So I just wanted to circle back, because I was asking about the base plan upgrade waiver process, and whether that had the same problem of disrupting petitions that were established through the regional transmission cost allocation planning process. And in the commission's order denying rehearing, the commission says both the base plan upgrade waiver process and STP's proposal in this proceeding relate to regional transmission cost allocation. And there's no discretion upon the STP board to grant a cost reallocation request. So it seems from that, and I'm looking at JA 499 paragraph 33, it sounds from that like the base plan upgrade waiver process would affect prior regional transition planning. And I guess I'm trying to understand. Well, you said you think it's dealing with a more finite group of facilities, but it doesn't seem to be distinguishable in terms of ex-ante or not. It is distinguishable in terms of ex-ante for a different reason. And I apologize that I didn't pick up on that there. But two paragraphs previous, in paragraph 31, the commission does say that the base regarding ex-ante cost allocation, because those are not facilities that are selected in the regional plan under the order 1000 process. They're selected for different reasons. Are they base plan upgrades? I mean, the way it sounds a lot like what we have here. I truly don't know. There's something different and more limited and they aren't planned as part of the regional planning and these facilities are. And I wish I did know more about them. I'm sorry that I don't, but the commission did find them kind of a weird little category that it's on its own. They're identified in a particular study that FPP does that has nothing to do with all the rest of this. So they're kind of a quirky little and that's why they have their own waiver process that I think no one might be helpful, given how much the, you know, this is an issue. If you would submit a letter or something on that, just to explain. Okay, it's not clear. Okay, sure. I appreciate the reference to paragraph 31, but I think the paragraph 33 is somewhat in tension with that. Okay, yeah, yeah. Of course, 33 does emphasize the scope point, but I take your point on that. We'll submit something. Uh, thank you. I was told it should be chin height, so it's a little different. Okay, thank you. Charlotte Taylor for Intervenor Supporting Respondent. Um, I wanted to talk about, uh, standing briefly and then, uh, a couple more thoughts on the ex-ante cost allocation as it relates to the discretion that STT's board has. Um, so on the standing issue, with respect to these four transmission facilities, the fate of those is going to be conclusively determined one way or another in the separate proceeding that is also before this court. It's not a case where this could go one way and there would still be a live controversy or another way and the controversy will be terminated because the outcome of that is going to be either it is just unreasonable to reallocate the costs for constructing those facilities and running them on a regional basis, in which case Sunflower will have achieved all of the relief that it is seeking for any concrete controversy that's currently presented, or the outcome will be it is not just unreasonable to reallocate, in which case I don't see any world in which it would be appropriate to go back to STT and use the black box waiver process to seek reallocation of costs for the same facilities that has already been determined by FERC and potentially affirmed by this court would not be just unreasonable. So then standing would have to be based on the prospect of future use of this waiver process. I would note that SPP at Joint Appendix 546 has specifically said it does not foresee another future filing similar to the proposal before the commission. It also did not join any argument with respect to standing in future facilities in its own brief that it filed in reply. So SPP has not come forward saying we do think that there's going to be future use of this waiver process that testifies this court Article III standing in this court rendering a decision. You're speaking in terms of standing, but it seems clear that at the outset there was standing. So the question really is a question of mootness, and the reason that's important, as you well know, is that the burden is on the defending parties to establish that the dispute is moot. So in the cases that say that there's a burden, a heavy burden to show mootness, those are cases where it's the defendant or respondent who's saying, you know, now we voluntarily cease the offending conduct. This is not that case. What's made this moot is that SPP with Sunflower sort of in tandem went and initiated another proceeding in which all of that relief is going to be sought. So I don't think that there's – I think, you know, this would be in the sort of typical mootness analysis where it's just standing in a timeframe, and with respect to those four facilities, there's no longer standing because they've been sort of, you know, split off, and there's going to be an up or down decision at the end of the day about reallocation for those. So then any standing would have to depend on the future use of this waiver process, and there I think we just have, you know, Lujan has its, you know, very well-worn but I think very helpful, you know, admonition that someday intentions without any description of concrete plans does not support a finding of an actual or imminent injury that the Supreme Court's cases require. And that's all that there is in the record excerpts at Petitioner's site. If you look at that, those are, you know, affidavits saying, you know, it is reasonable to expect that there are going to be future invocations of this waiver process, but there's no actual, you know, concrete case in which that would be, you know, that we know about that's coming down the road, and that's just not enough for Lujan and for the purposes of standing. In the cases where the intervenor, I recognize that SPP has intervenor, if it has standing, then that would be sufficient for Article III purposes. But if you look at those cases, there's at least something that the RTO or similarly situated entity would have to do. So, for example, in the Ameren case that we cite in our brief for this proposition, the relevant RTO is going to have to go amend its tariff, right? But here we just have the rejection of a tariff amendment, so SPP will be not in a position to do anything. It just will not use this thing that was proposed. Why is that the way to look at what happened here as opposed to there was an amendment to the tariff allowed and the order on review now strips that authority out of the tariff? Because it was never finally approved, right? So, there was sort of that interim order said, you know, make this amendment, and then, you know, we think it'll be okay. Then we sought rehearing of that and made arguments and others, right, and made arguments for why it was inappropriate for change its mind, but it was never accepted. And in other cases, such as the New Jersey versus EPA case that's cited, New Jersey was able to say, you know, on an ongoing basis, we're harmed by these recordkeeping requirements. There's upstream pollution that is affecting us, and so that's the kind of harm that supported standing for sort of the, you know, equivalently situated party. On the merits, on the X, I'm happy to talk more. So, what would the practical result of that be? It would be SPP doesn't have this authority. So, when there is another facility on the horizon, even if it's not enough, wouldn't be enough for standing, then they have to come and reinitiate this whole proceeding, or would they even be able to mount a collateral attack on? Well, I mean, first, I would note that it's pretty well established that just because, you know, if you don't have standing now, the fact that that might frustrate review eventually doesn't create standing in the current controversy. But again, SPP doesn't believe that there is going to be such a case, and I think that's very relevant to the standing inquiry. But yeah, I think that, you know, the result would be that this waiver process would not exist, and it wouldn't be used in future, and so it would not be challenged on the merits. But that's the fact of, you know, in large part, because SPP did not come forward and say, yes, as regulator, we, you know, we anticipate that this will be used, and here's why. On the question of the ex-ante allocation on the black box, I just wanted to sort of take a step back and think about how this is going to look. So, if you go back to Order 1000, the reason why that was adopted was already because there was anticipated expanded use of renewable energy sources, and there was going to be a need for this kind of regional planning process. After that, we have SPP institutes the highway-byway methodology that is designed to take into account of precisely these types of considerations that there's going to be, you know, some facilities are going to be long-distance transmitting power. And everybody engages in a planning process that with the highway-byway methodology in mind, right, up above a certain threshold, it's a highway, in the middle, it's a byway, and it'll be allocated the two-thirds one way, and then locally, it will be allocated for the lower voltage transmission projects, it will be allocated locally. Then, everybody goes through that, we get to a result where something is allocated to be a byway facility, and SPP approves construction of it. Then you have a, I mean, who knows what this process is going to look like in terms of the amount of consensus, because there's so many different moving parts, right? So, the SPP staff issues a report and recommendation that goes to the SPP board and the RSC. Then, the cost allocation working group issues a separate report and recommendation that goes to the regional state committee. All along the way, stakeholders are submitting comments on these public recommendations and may have, are very likely to have disparate views about whether the factors are met. And then you get to the SPP's final determination, and it's, you know, doesn't have to say why it came out one way or another. That's the process that, in fact, if you go back to ex-ante, the sort of, you know, the planning, people won't know what's going to be the outcome of ultimate cost allocation for the byway facility. So, that's why this sort of discretionary black box method undermines that key principle in Order 1000. When did the allocation, when did the regional planning take place, and how often does that occur? So, the regional planning process, I don't know those precise timelines, but that is the way in which the construction of new facilities, like the need is identified, and then they are approved through this collaborative planning process. You don't know how often it takes place? No. When this occurred? I think, I mean, I, no, I don't, on an ongoing basis, or certainly, I mean, it's a regular, the purpose, I mean, one of the main functions of SPP under Order 1000 is to identify the need for transmission projects. How discretionary is the proposed tariff amendment anyway? I mean, it uses, you know, directory mandatory language within it. So, it says that the three criteria are the only criteria that SPP is supposed to consider, but it doesn't take that extra step and say when they're satisfied, then this is approved. Oh, yes, it does. It has to be decided based on the three, and therefore, if they're met, it has to be approved. If they're not met, it has to be rejected. That's what I read it. I mean, I think it doesn't say if they're met, it has to be approved. If they're not met, it doesn't, it doesn't get approved. It says it shall be based on the three criteria. We say that that's the fair reading of it, and we think that that's the way it should be read, and doesn't that solve the problem? Well, I think you still then have the problem of the fact that we're just really not going to know. So, it's not going to be a scenario where the SPP staff makes a reporting recommendation, says here's why we think the three criteria are met, and then the SPP board sort of votes yes, right? It's going to be a much more messy contested process in which you have, you know, a couple of different reports and recommendations and also input from all of these different stakeholders. So, even if we assume, I think, you know, then we get to the problem of so what do you do with that, right? Even if we assume that SPP only considered those factors, it's going to be a contested factual question as to whether they were met, which study to rely on, why they were met. And then that's not what sort of, you know, administrative process is supposed to look like. I think that, you know, then you get to the other side of it. It's like, well, why did SPP conclude that the benefit criterion was met? And we just don't know. The application and its analysis and the SPP staff's response to that is all in public record, and there's a hearing at which stakeholders can show up. So, the entire record indicating which way that points is transparent. But the reasons why, so, again, as my colleague said, it's as if, you know, FERC went through the entire process of having everybody participate and file briefs and make a record, having a technical conference. And at the end of the day, it just, you know, says sort of, you know, thumbs up, thumbs down. The hypothetical is basically there's a staff recommendation, and everything in the record seems to show all three criteria are met, and all you get from SPP is denied. And then not only do the current parties not know, but future parties can't compare themselves to whatever happened in that proceeding in any intelligible way. Yeah, that's right. And that also undermines the predictability, right? So, even if, in theory, you could then bring a 206 proceeding to the out, you know, challenge to the outcome and say this is not just unreasonable, that's not, you know, how this is supposed to work. You're supposed to know in advance at the planning stage how, you know, any individual cost allocation is going to go. And then, you know, to the extent that there are, you know, overarching cost allocation or cost causation problems, then that's where 206 comes in again. And I think that's something that petitioners really sort of are sidestepping, which is, you know, there's not – there has never been a demonstration that the existing highway-by-way methodology is not achieving the rough approximation that cost causation requires in the aggregate. And, in fact, the RCAR process, which just, you know, wound up, didn't show any overall imbalance. So, it, you know, may be permissible in, you know, the separate proceeding. There's a request to – for FERC to approve as just and reasonable, a sort of specific fine-tuning of that. But the overall process is, you know, has to be presumed to be achieving appropriate cost causations. And even if you don't want to presume that, you can look at the RCAR analysis that just took place. Where is that when you say the RCAR analysis that just occurred? That's regional planning, right? So, that's built into the highway-by-way framework. And it says every six years there has to be an overall assessment. It looks at cost and benefits for each zone and comes up with a ratio. If that ratio gets out of whack, then there's a process to apply for, you know, some relief. But, so far, that – The page number to support what you were just saying about how that showed there was no cost causation imbalance. I can get you – well, I will – let me grab that for you at the end. I just wanted to make – so, I think that isn't directly – I mean, we're not claiming that the RCAR, you know, analysis, you know, is directly at issue in this record, though. It's, you know, here the commission appropriately decided that this is just too sort of – too discretionary, too uncertain. It's not going to create enough guidance. And so, it is intentioned and trumped by the need for X anti-cost allocation determinations. In the other proceeding, I think you will hear more about the RCAR outcome. And I apologize, I'm not able to find in my notes the page number for the RCAR. Didn't the other waiver provisions that were mentioned in the papers before the commission and to us also get approved by secret ballot by the SPP board? Yes. And that's not problematic in terms of excess discretion because? So, I think for two – for slightly different reasons. First, I think both of them are much, much narrower in scope than the potential applications of this, right? This applies to any byway facility. It doesn't have to be linked to renewable generation. It doesn't have, you know, any temporal limitations. But it has the first two factors which show, you know, an effort to identify which byway facilities are really serving zonal load. Right, but any byway facility is eligible. And just as a practical matter, the sort of – the cost of constructing new transmission just far outweigh the cost of, you know, for the transformer waiver. That's a very narrow subset of, you know, just smaller piece of equipment that connects a low voltage to a high voltage facility. And then for the base plan upgrade waiver process, again, that is not part of this regional planning process that is specifically subject to Order 1000's cost – ex-ante cost allocation principle. And so, for that reason, it was not arbitrary and capricious for the commission to decide, you know, when it's not even part of the Order 1000, you know, it's not even under that umbrella. Or when it's, you know, in practical terms, a very, very small, not very relatively expensive subset of applications, it's not going to be, you know, overall problem in terms of our ex-ante cost allocation policy to allow SPP to exercise some, you know, discretion and have that, you know, secret ballot sort of similar procedural requirements. But when it's something as potentially significant as regional cost allocation for these very expensive transmission projects, then we do need to conclude that this is just too much discretion. And I would also just underscore that petitioners are trying – you know, they say, well, this is – all this change is the composition of the commission. The composition of the commission was just that Chairman Glick, you know, stepped down. But it was the same – two of the commissioners just fought it over and changed their mind, right? It's not a case where you had a sort of one new appointee and then it went from 2-3 to 3-2. You had a very thoughtful concurrence from the commissioners, Simons and Phillips, saying, you know, they were on board, but then that's what rehearing is for. They, you know, they heard our arguments on rehearing and those of others who participated, and they said, you know what, at the end of the day, as much as we supported this in theory, there's simply too much discretion for SPP for this to be permissible. It's hard to read the record and the background in terms of the amount of stakeholder involvement and think, well, what's needed here is something with stakeholder involvement. It seems like there was many opportunities and, in fact, a great deal of stakeholder involvement. I mean, I think – yes, certainly this is a process that everybody put a lot of thought into, but I think that was essentially, you know, saying we appreciate that, you know, that you've tried this, but when we finally got to the end and looked at how this was going to operate, it's simply not going to be, you know, allowable to do this where SPP doesn't issue, you know, an opinion, doesn't provide any guidance. You have, you know – and so, you know, come up with something else, go back and, you know, work again with the stakeholders and try again if you think that there's an overarching problem here. And meanwhile, there is the, you know, the mechanism that's being used in the separate proceeding, which is that for individual facilities, if those are out of balance, then SPP can, as it did here, seek, you know, case-by-case cost reallocation, show that it's just unreasonable. And we all, of course, we disagree with that, but, you know, we're going to have that fight in the correct procedural posture, which is through presentation to FERC, which is the federal agency with congressionally delegated authority to make these decisions. And it can decide what's just and reasonable, and that will be reviewed by this court on a record that doesn't include a decision-maker that didn't offer any explanation of its reasons. Thank you. Oh. Sorry. For the RCAR, Carol, it's JA-235. Okay. Thank you. Thank you. All right. Does Ms. Murphy – she reserved no time, but we'll give her three minutes. Thank you. If I can make just a few points about standing and a few points about the merits. First, on standing, I think it was quite clear in our opening brief that we had standing. We laid out not only that we are entities that are members of SPP, but also explained that Sunflower had sought those waivers while the existing process was in place. And as FERC and respondents have acknowledged, at the time we filed our opening brief, FERC had not granted the 205 relief. So if there was a change in circumstances that happened after our opening brief, and as we explained in our reply brief, there's not a mootness issue for the reasons we've already discussed on the existing facilities. I don't take respondents to dispute that we have a live controversy there. You made kind of a novel argument that this is not a case where FERC has said, oh, we're going to peel off these petitioners and resolve their problem and thereby moot the broader concern. It's a situation in which petitioners filed separate petitions. So in a sense, they peeled off. And then the question is, she, as I understand it, is saying we shouldn't look at this as a situation in which the burden has shifted. The standing has sort of been gutted in this Section 205 proceeding by the petitioners getting the relief, the only pending relief that they are seeking in that other proceeding. And yes, that's not final. But apart from that, how would you respond? I mean, it is a novel argument that I don't recall seeing in their brief, but I'm not aware of any authority that really says that mootness is only a burden if you're a party who tried to affirmatively moot a case. In any case where you have mootness as an issue, it's always a high burden to satisfy mootness. I've never understood that to be a doctrine that's confined to circumstances involving something like voluntary cessation or whatever it may be. It's just a burden to demonstrate mootness because mootness is trying to essentially overcome the burden that's already been satisfied in the first instance of showing that you have standing. And I also heard a little bit different argument today about this idea that those 205 proceedings are kind of binary in the sense that they will definitively resolve this no matter what, one way or another. I don't see how that seems right either because it's absolutely open to challengers in that proceeding to make procedural arguments, not just substantive arguments. And they could easily be making arguments that they don't think FERC adequately explained its reasoning, whatever it may be, that could not definitively resolve the question of whether we're entitled to the release. So those arguments are all on the table. That is all issues that can still be lied before this court. So there's very much still a live dispute. Again, we absolutely think FERC got it right in those orders, but that's not the question for purposes of jurisdiction. Can I ask you why Sunflower or Midwest or STP didn't file a 206? We think it makes sense that given all of the stakeholder process that went into this, to first do what we believe we have a right to do, which is challenge FERC's rejection of this process, of this tariff amendment. And it makes more sense to start with, let's defend the product of the stakeholder process rather than throw all that out and go do a 206 and say, let's start from scratch and have FERC think about this differently. We absolutely have a right to come here. We've got here an effort to put in place a waiver process. We're the parties who would want to seek waivers. It makes a lot of sense for us to say, let's review whether FERC had adequate justifications for rejecting this process before we say, okay, let's kind of go at this through a completely different route, through a completely different set of different kind of petition in which you wouldn't be looking at all the work that was put into this to get where we are today. None of this came up in the RCAHR process? No, the RCAHR process, I do want to make very clear. I mean, FERC just like explicitly rejected the reliance on this argument. JA331 in the approval order explained that the RCAHR process is not something that was a basis to reject this. So that is not an argument that FERC has embraced. It never backed away from that. It doesn't make it in its brief. So really there is a tenory problem with respondents introducing it in this particular proceeding. But again, as FERC explained in more detail in the separate allocation 205 proceedings involving the Sunflower facilities, the RCAHR process is just different. It's something that happens every six years. It's not something that requires there to be tariff amendment changes if you identify an issue. And it's looking at things at a different level, at the zonal level. It's not focused on identifying if there's particular facilities whose costs aren't being adequately allocated. So I don't think it provides any basis to reject this order. But I mean, I guess another question is why wasn't that actively used by Sunflower Midwest STP to validate the results of this process? It's just not a process that looks at things the same way. It doesn't involve the same kind of criteria. It's just a process that's designed to kind of – the point of it is to be looking at on a going forward kind of 40-year basis is what is in place in the tariff kind of right from a big picture standpoint. It's not kind of looking at it at the detailed level that we're looking at here. And it only occurs on kind of a set timeline and all of that. So it just isn't designed to answer this question, which I think is why FERC has never accepted the argument that we should be doing this and kind of be constrained to do this through the RCAR process instead of by working through a proposed tariff amendment that identifies a cost causation problem and a solution to it that FERC has never denied would produce just and reasonable rates. And what I hear FERC saying today in defense of that, I mean, I think we're down to just transparency and discretion because I understand FERC's argument to be that the ex-ante concern is really only a byproduct of transparency and discretion, not an independent basis for rejecting this. And on the discretion point, as the questioning has gone through today, I mean, it's just not right to say that the board doesn't have to grant a waiver if the criteria are satisfied or denied if they aren't. That's the necessary implication of saying your decision has to be based solely on whether all three criteria are satisfied. If you're acting on any other basis, you're violating the tariff. So what it seems to come down to is this whole kind of black box concept. But the problem with that argument, I mean, is SEP's board does all voting in secret. That's part of its tariff. It was designed that way because FERC wanted SEP to ensure that the board had sufficient independence. That's why all votes on everything, including cost allocation issues under the other waiver processes we've discussed, are taken in secret without any kind of written explanation. And it's why I think if you look at the reversal order, so this is the order where FERC's rejecting this, they nonetheless went out of their way to say, this is on JA-499 at footnote 62, that while the SEP board votes in secret, this feature of the board's governance is not an issue in this proceeding, nor do we suggest any deficiency in it. So they said they don't have a problem with the fact that the board votes in secret. And I don't really see how they could, since that's what the board does in every context. They've never taken issue with it. They've never said the board needs to issue any kind of opinion. And there's not really any problem with reviewing it in the same way that this court— They're not questioning it for what SEP appropriately does, but they're saying, and this is not the kind of thing that they should be doing. That's how I understand their argument. I mean, I just don't think—I mean, it's not consistent with the history of how FERC has dealt with the SPC's board when they're exercising discretion in other contexts. And I don't think this argument that because they vote in secret, the whole process becomes a black box process really works in practice. I mean, just as this court—if a district court issues an opinion without a lot of reasoning, this court doesn't—you don't just throw up your hands. You can look at a record and determine whether the decision is consistent with that record. And all of the transparency that was introduced into this process ensures that if you have the hypothetical scenario of everybody said the criteria is satisfied, there's nobody really even disputing it, and all of a sudden you get a denied ruling from the board, you're going to have an extremely powerful Section 206 application that's going to produce an opinion from FERC that says— It's actually 206 in that context because if you're challenging denial of the specific—how they acted on the specific costs, you'd go through that process. But you're going to get a FERC opinion that's going to say, no, no, you know, the tariff says if they're satisfied, you have to approve, and there's nothing in this record that gives us a basis to think it won't be. So I just don't think these concerns actually have any basis in reality. Thank you so much. All of you. It was a very helpful argument. Cases submitted.
judges: Pillard; Wilkins; Garcia